FILED
United States Court of Appeals
Tenth Circuit

**March 22, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

HALLIE IRVIN,

     Defendant - Appellant.

No. 10-3106
(5:06-CR-40151-JAR-3)

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee.

v.

F. JEFFREY MILLER,

     Defendant - Appellant.

No. 10-3107
(5:06-CR-40151-JAR-1)

---

**ORDER**

---

Before **MURPHY, EBEL,** and **TYMKOVICH**, Circuit Judges.

---

These matters are before the court on F. Jeffrey Miller's *Petition For Panel*

*Rehearing, Or, In The Alternative, Rehearing En Banc,* filed in appeal number 10-3107.

We also have a response from the government. Upon consideration, we grant panel rehearing and direct the clerk of court to substitute the revised opinion attached to this order for the original decision issued in these appeals on August 31, 2011.

In this regard, we note that because no petition for rehearing was filed in companioned matter 10-3106, *United States v. Irvin*, the mandate issued in the normal course on September 22, 2011. Because the grant of rehearing in number 10-3107 necessarily impacts the *Irvin* opinion, however, we *sua sponte* recall the mandate in that case and likewise direct the clerk to file the attached new decision in that appeal. The new opinion will reflect today's filing date.

The suggestion for rehearing en banc filed with the petition for rehearing in number 10-3107 was circulated to all the judges of the court who are in regular active service. As no member of the panel or the court called for a poll on that request, the suggestion for en banc rehearing is denied.

Entered for the Court,

ELISABETH A. SHUMAKER
Clerk of Court

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 22, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

        v.

HALLIE IRVIN and F. JEFFREY
MILLER,

        Defendants - Appellants.

Nos. 10-3106 and 10-3107

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 5:06-CR-40151-JAR-3 & 1)**

---

John T. Carlson, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, and O. Dean Sanderford, Assistant Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant, Irvin.

Jeffrey D. Morris of Berkowitz Oliver Williams Shaw & Eisenbrandt LLP, Kansas City, Missouri, for Defendant-Appellant, Miller.

Richard L. Hathaway, Assistant United States Attorney (Barry R. Grissom, United States Attorney, and Christine E. Kenney, Assistant United States Attorney, with him on the briefs), District of Kansas, Topeka, Kansas, for Plaintiff-Appellee.

---

Before **MURPHY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I.    Introduction

Appellants F. Jeffrey Miller and Hallie Irvin were charged in an eleven-count indictment with a variety of crimes stemming from an alleged conspiracy to defraud mortgage lenders in connection with the subprime housing market.  After a month-long jury trial, Miller and Irvin were each convicted on several of the charges and sentenced.  They now appeal their convictions, citing numerous evidentiary and legal errors.  Miller also challenges his sentence.  Exercising jurisdiction under 28 U.S.C. § 1291, we now **REVERSE** their convictions in part, **AFFIRM** their convictions in part, and **REMAND** for further proceedings.

## II.    Background

Miller was a builder and developer involved in residential construction in Kansas, Missouri, and other states.[1]  There being many competing developers marketing their homes to well-qualified buyers, Miller chose to focus his business on the relatively untapped subprime market, *i.e.*, buyers with low income and poor credit.  The marketing of Miller's homes was handled by Stephen Vanatta, who would refer potential buyers to a mortgage broker named James Sparks for financing.  Upon the successful closing of a home sale, Miller was paid out of the mortgage loan proceeds while Sparks received a commission from the mortgage lender, which he shared with Vanatta.  Because a prior

---

[1]We summarize the facts in the light most favorable to the government, drawing all inferences consistent with the jury's verdict.  *United States v. Winder*, 557 F.3d 1129, 1132 (10th Cir. 2009).

felony conviction for passing a bad check prohibited Vanatta from maintaining a checking account, his portion of commissions were paid by checks issued to his wife, appellant Irvin.

Despite the eagerness of lenders to extend mortgage loans, Sparks often had trouble securing financing for Vanatta's subprime applicants. In order to ensure that otherwise unqualified buyers could obtain financing, Sparks and Vanatta enhanced such buyers' apparent creditworthiness by, among other things, overstating the buyers' income, altering bank statements to add deposits, and drafting false letters of employment. The mortgage lenders were further induced to extend financing through Miller's use of inflated home appraisals, overvaluing the relevant properties and thereby enhancing the lenders' perceived loan-to-collateral ratio.[2] Reflecting these inflated home valuations, however, occasionally required Sparks to surreptitiously increase the sales price on previously signed sales contracts. To convince the surprised buyers to proceed with their purchase after discovering the price change, Miller would himself offer to extend a second mortgage, referred to as a seller carryback, covering the difference between the first mortgage and the adjusted purchase price. Finally, to bring the effective purchase price back in line with the originally agreed-upon amount, Miller would agree to

---

[2]For example, if a buyer was interested in purchasing a house priced at $100,000 but unable to secure a loan of that size, a new appraisal would be arranged that increased the appraised value to $120,000. The buyer would then apply for the same $100,000 loan, which the lender would believe was secured by $120,000 collateral and therefore much less risky.

discount the amount owed on the seller carryback if the buyer successfully refinanced the first and second mortgages.[3]

The government became aware of these fraudulent activities due to a report made by the accounting firm, Meara King & Company ("Meara King"). Meara King was monitoring Miller's business activities in accordance with a certain agreement entered into by Miller as a condition of his release in connection with another criminal prosecution (the "Monitoring Condition").[4] While reviewing a home sale referred to herein as the "Jordan Transaction," Meara King noted a sizable discrepancy between the reported value of the property and the value assigned to it by Meara King's appraiser. It reported this discrepancy to the United States Attorney's Office, which began an investigation. The investigation ultimately led to Miller, Vanatta, Sparks, Irvin, and Miller's former employee Sandra Harris, being charged with a variety of criminal offenses including bank fraud, conspiracy to commit bank fraud, money laundering, and criminal contempt for knowingly violating the order setting Miller's conditions of release in *Miller I*.

Sparks pled guilty to one count of conspiracy pursuant to an agreement whereby he agreed to testify against his co-defendants as a cooperating witness. The remaining

---

[3]In the above example, the seller carryback mortgage would be $20,000, reflecting the difference between the $100,000 first mortgage and the $120,000 inflated sales price.

[4]The other prosecution, *United States v. Miller*, No. 06-40068-01 (D. Kan. Feb. 12, 2010) (hereinafter "*Miller I*"), went to trial and ultimately resulted in Miller's acquittal on all counts.

defendants were tried on the following charges: conspiracy (Count 1); two counts of bank

fraud (Counts 2 & 3); two counts of money laundering, each count tied to one of the

substantive bank fraud charges (Counts 4 & 5); destroying records in a federal

investigation (Count 6); corruptly influencing a witness (Count 8); and four counts of

criminal contempt, for either violating the Monitoring Condition set in *Miller I*, or for

aiding and abetting in those violations (Counts 9–12).[5]  Following a lengthy trial, the jury

acquitted Harris of all charges.  Miller, Vanatta, and Irvin were each found guilty of

Counts 1, 5, 9, and 10.  Vanatta and Irvin were additionally found guilty of Counts 2 and

4.

Prior to sentencing, Miller, Vanatta and Irvin moved for entry of judgments of

acquittal, alleging insufficient evidence to sustain a conviction.  Alternately, the

defendants requested a new trial based upon certain alleged errors committed by the trial

court.  These motions were denied by the district court.  Miller and Irvin now challenge

their convictions on essentially the same grounds presented below.  Miller also challenges

his sentence.

## III.    Discussion

### A.    Challenges to Admitted Evidence

#### 1.    Admission of Exhibit 1-2

The testimony of cooperating defendant Sparks formed much of the government's

---

[5]Count 7 charged the defendants with harassing Sparks in an effort to dissuade him from testifying, but was dismissed before trial.

case against Miller and Irvin. Over the course of four days, Sparks described the various forgeries, misrepresentations, and other fraudulent activities he allegedly engaged in with Vanatta to obtain financing for unqualified buyers. In all, Sparks related the particulars of twenty-two separate transactions involving Miller-built homes. During this testimony, continual reference was made to government Exhibit 1-2, a chart displayed before the jury that purported to summarize the relevant details of these transactions. This chart was entitled "Summary of Fraud for JEFF MILLER et al., Fraud That Can Be Identified By James Sparks." It included information identifying the date, location, and buyer for each transaction, as well as a column labeled "False Statements to Lenders," which listed the various specific fraudulent representations and actions described by Sparks.

Exhibit 1-2 was initially offered by the government under Fed. R. Evid. 1006 as a summary of several boxes of "loan files" pertaining to the allegedly fraudulent home sales. The defendants vigorously resisted the admission of the summary chart, filing a motion in limine and repeatedly objecting during trial. The district court ultimately agreed with the government and admitted Exhibit 1-2 under Rule 1006. Arguing the requirements of Rule 1006 were not satisfied and the loan files upon which Exhibit 1-2 was based constituted inadmissible hearsay, Miller and Irvin contend the district court's decision is reversible error. We review a district court's decision to admit summary charts under Rule 1006 for abuse of discretion. *United States v. Thompson*, 518 F.3d 832, 858 (10th Cir. 2008).

Rule 1006 provides, in relevant part: "The contents of voluminous writings,

recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place."  Fed. R. Evid. 1006.  Although the materials upon which a Rule 1006 summary is based need not themselves be admitted into evidence, they must at least be *admissible*.  *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999).

Miller and Irvin argue the loan files purportedly summarized in Exhibit 1-2 constituted hearsay that was not shown to qualify for any exception to the prohibition on hearsay evidence.  When this same challenge was raised before the district court, the government attempted to show the loan files were admissible under the business records exception established by Fed. R. Evid. 803(6).  Pursuant to Rule 803(6), business records are admissible despite their hearsay nature if the records' custodian, or another qualified witness, testifies the records (1) were prepared in the normal course of business; (2) were made at or near the time of the events recorded; (3) were based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) are not otherwise untrustworthy.  *United States v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008).  The government offered Sparks as the witness qualified to make these foundational showings.  Sparks, however, testified the loan files were largely maintained by various title companies for whom he had not worked and under circumstances of which he had no personal knowledge.  Furthermore, Sparks could not state whether the loan files were made or kept by the title companies in the regular

course of their businesses. He also indicated that various documents within the loan files had been removed, destroyed, or otherwise modified. His testimony, therefore, was insufficient to establish the admissibility of the loan files as business records.

Before ruling on the admissibility of Exhibit 1-2, the district court acknowledged the documents summarized by a Rule 1006 chart must themselves be admissible. Nevertheless, it reasoned that, while Sparks's testimony had not established admissibility of the loan files under Rule 803(6), neither had the defendants demonstrated the loan files would *not* satisfy the business records exception if the government presented testimony from the appropriate records custodians. Because it had "heard nothing that contradicts the idea that [the loan files] are business records and would meet the business records exception," the district court overruled the hearsay objection and received Exhibit 1-2. It reaffirmed this ruling several times throughout the trial. The district court abused its discretion by admitting Exhibit 1-2.

The materials summarized by Rule 1006 evidence must themselves be admissible because a contrary rule "would inappropriately provide litigants with a means of avoiding rules governing the admission of evidence such as hearsay." *Samaniego*, 187 F.3d at 1224. Accordingly, just as the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception, *Ary*, 518 F.3d at 786, so too must the proponent of a Rule 1006 summary based on hearsay evidence establish that the materials summarized are admissible. *Samaniego*, 187 F.3d at 1224. Contrary to the district court's ruling, Miller and Irvin were under no obligation to affirmatively *disprove* the

applicability of the business records exception. The burden was on the government alone. By not requiring the government to lay the foundation necessary under Rule 803(6), the district court erred as a matter of law. *Id.*

The government seeks to avoid this conclusion by explaining that, contrary to its representations before the district court, Exhibit 1-2 summarized not only the aforementioned loan files, but also the trial testimony of Sparks and other government witnesses.[6] Therefore, the government reasons, Exhibit 1-2 constituted a "hybrid" summary chart, admissible under Fed. R. Evid. 611(a). The government's logic eludes the court, for the loan files remain inadmissible hearsay.

Rule 611(a) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). This directive has in some circuits been read as authorizing the use of summary exhibits for pedagogical purposes, wholly apart from Rule 1006. *See, e.g., United States v. Milkiewicz*, 470 F.3d 390, 397 (1st Cir. 2006); *United States v. Bray*, 139 F.3d 1104, 1111-12 (6th Cir. 1998); *United States v. Johnson*,

---

[6]Rule 1006 permits the use of exhibits summarizing only "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court." Fed. R. Evid. 1006. To the extent the government's revisionist assertions indicate Exhibit 1-2 summarized witness testimony, therefore, they further emphasize that the chart's admission under Rule 1006 was in error.

54 F.3d 1150, 1157-59 (4th Cir. 1995). Nothing in Rule 611(a) or the cases interpreting it, however, indicates that such pedagogical exhibits can be used to summarize otherwise inadmissible hearsay evidence, such as the loan files. Indeed, the cases discussing Rule 611(a) summaries typically require the summarized evidence to be affirmatively *admitted* into evidence. *See Milkiewicz*, 470 F.3d at 397 ("A summary chart used as a pedagogical device must be linked to evidence previously admitted . . . ."); *Bray*, 139 F.3d at 1111 (same). Such a requirement is consistent with the spirit of Rule 611(a), which, in discussing the presentation of evidence, presupposes the suitability of such evidence for presentation, as well as our existing Rule 611(a) jurisprudence. *See United States v. Stiger*, 413 F.3d 1185, 1198 (10th Cir. 2005) ("[A] party may only admit summary testimony under Fed. R. Evid. 611(a) if the District Court previously admitted at trial the evidence that forms the basis of the summary."). In short, resort to Rule 611(a) in no way resolves the hearsay problem that renders Exhibit 1-2 inadmissible.

This analysis, however, does not conclude the inquiry, because "this court applies a harmless error standard when reviewing trial courts' rulings on hearsay objections resting solely on the Federal Rules of Evidence." *United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009) (quotation and alteration omitted). "A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *Id.* (quotation omitted). In evaluating whether the district court's erroneous admission of Exhibit 1-2 was harmless, "we review the record de novo to determine whether the evidence . . . had a substantial influence on

the jury's verdict in the context of the entire case against [the defendants]." *United States v. Wilson*, 107 F.3d 774, 785-86 (10th Cir. 1997) (quotation omitted).

The government bears the burden of proving the error was harmless. *United States v. Velarde*, 214 F.3d 1204, 1211 (10th Cir. 2000). It has not adequately carried this burden. Exhibit 1-2 was displayed before the jury throughout Sparks's direct testimony, listing the government's allegations using suggestive terminology (*e.g.*, referring to commission payments as "kickbacks") and organizing them into a simple and comprehensible chart beneath condemnatory section headings (*e.g.*, "Summary of Fraud for JEFF MILLER et al." and "False Statements to Lenders"). The district court itself later acknowledged the prejudicial influence of the exhibit's rhetorical aspects and ordered several redactions to the chart's accusatory terminology before sending it into jury deliberations. Although these revisions were appropriate, they came too late. More importantly, they did not address the core prejudicial impact of this inadmissible exhibit, *i.e.*, the compelling simplicity with which Exhibit 1-2 reduced weeks of complex testimony and inadmissible hearsay into an easily digested summary.

The government itself confirmed this was the primary benefit of the summary chart. In advocating the propriety of Exhibit 1-2 before the district court, the government highlighted its significance: "The more that this document is challenged the more it emphasizes the importance, and particularly in a fraud case where we have a cooperating individual, of having a document that in one comprehensive format identifies the various kinds of frauds and the patterns." Focusing on the usefulness of Exhibit 1-2 in jury

-11-

deliberations, the government further explained: "[I]t's more significant than ever that the jury have this back in the jury room . . . as something that will be a roadmap . . . ." The government's advocacy for Exhibit 1-2 in the district court belies its assertions of harmlessness on appeal. *See United States v. DeLoach*, 504 F.2d 185, 192 (D.C. Cir. 1974) (noting that a prosecutor's "own estimation of his case, and of its reception by the jury at the time, is, if not the only, at least a highly relevant measure now of the likelihood of prejudice").

In contrast to the litany of direct evidence indicating Vanatta's and Sparks's illegal activities in furtherance of the conspiracy charged in Count 1, Miller's and Irvin's connections with the conspiracy were primarily supported by circumstantial evidence, such as Miller's admitted desire to sell his houses at the highest possible price and Irvin's preparation of invoices for "construction management fees" that secretly represented Vanatta's real estate marketing commissions. Although the evidence is sufficient to sustain the jury's verdict on Count 1 as a purely legal matter,[7] we are left in grave doubt that the verdict would have been the same had the objection to Exhibit 1-2 been sustained. Miller's and Irvin's convictions on Count 1 are therefore reversed.

Nevertheless, the admission of Exhibit 1-2 was harmless error in relation to Counts 2, 4, 5, 9 and 10, which are discussed in greater detail below. Those counts—each of which alleged a discrete instance of criminal activity—did not present the factual

---

[7] Neither Miller nor Irvin now contest the sufficiency of the evidence supporting their convictions on Count 1.

complexity characteristic of the conspiracy in Count 1, and were therefore less susceptible to the summarization of the evidence in Exhibit 1-2. The bank fraud and money laundering charged in Counts 2 and 4, moreover, were not reflected on Exhibit 1-2 at all, and the government's case on those counts was supported by a wholly separate body of evidence. Counts 5, 9, and 10, by contrast, centered on criminal conduct committed in connection with the so-called Jordan Transaction, which *was* summarized on Exhibit 1-2. Each allegation concerning the Jordan Transaction contained in Exhibit 1-2, however, was independently supported by sufficient properly admitted evidence and witness testimony. Furthermore, while the majority of the transactions summarized on Exhibit 1-2 received only passing mention during the trial, the Jordan Transaction upon which Count 5 was premised was discussed repeatedly and at great length during trial. Any influence that Exhibit 1-2 might have had upon the jury's verdict on Counts 5, 9, and 10 was, therefore, minimal.

### 2. Admission of Exhibit 2009

Exhibit 2009 is a review appraisal prepared by Pinnacle Appraisal Group LLC at the request of Meara King, the accounting firm monitoring Miller. The appraisal concerned the property sold by Miller in connection with the Jordan Transaction. It concluded the property was worth approximately $185,000, and that an earlier appraisal of $220,000 reflected an inflated valuation. Stephen Browne, a partner at Meara King, was called upon to provide the necessary foundational showing and testified that he and his firm regularly ordered, received, and relied upon such appraisals as a protocol in

monitoring businesses, including Miller's. He further testified that Meara King routinely worked with Pinnacle in obtaining appraisals and that Exhibit 2009 was prepared by Pinnacle shortly after a request was made. Browne also explained that Meara King created a database where all information relating to the monitoring of Miller's businesses was stored, including any appraisals and accounting documents accumulated through the process. Miller and Irvin objected to the admission of Exhibit 2009 on hearsay grounds, but the district court ruled the document was admissible as a business record pursuant to Fed. R. Evid. 803(6). Miller and Irvin contend this ruling was error.

Rule 803(6) provides[8]:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
. . . .

(6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian

---

[8]Beginning December 1, 2011, the wording of Rule 803 was changed to improve its clarity. The changes were "intended to be stylistic only" and do not displace any of this court's prior holdings on evidence admissibility. Fed. R. Evid. 803, advisory committee's note (2010 amendments).

or another qualified witness . . . ; and

(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Relying on *United States v. Carranco*, 551 F.2d 1197, 1200 (10th Cir. 1977), the government contends Exhibit 2009 was admissible through the testimony of Browne as an "adoptive" business record. The government reads *Carranco* as holding a record prepared by one company and "incorporated and adopted into the records of the witness's company" satisfies the requirements of the business records exception to the hearsay rule. *Carranco* does not so hold. To the contrary, *Carranco* expressly recognized such an argument could have been made on the facts of that case, but declined to separately consider it because the necessary objections had not been made before the trial court. *Id.* at 1199. *Carranco* did concern the admissibility of a freight bill prepared by one party, Admiral Merchants, and used by another party, ICX. *Id.* The objection at issue, however, was limited to whether notations made by ICX on the freight bill precluded its admissibility because they were not made in the regular course of business. *Id.* At best, *Carranco* can be read as assuming, without deciding, that one company can "adopt" the business records of another company for purposes of Rule 803(6).

This court has therefore never decided whether "adoptive business records" are admissible under Rule 803(6).[9] The court need not do so today, however, because even

_____

[9]*Contra United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) (incorrectly listing Tenth Circuit as having adopted the adoptive business records

(continued...)

-15-

if Exhibit 2009 was erroneously admitted, the court concludes such admission was harmless as to both Irvin and Miller. *See Collins*, 575 F.3d at 1073.

As to Irvin, the record shows the government did not rely in any way on Exhibit 2009 to prove she participated in the Jordan Transaction and therefore its admission is harmless as to her convictions for Counts 5, 9, and 10. As to Miller, Exhibit 2009 was but one of many pieces of evidence indicating the valuation of the Jordan home was inflated. It was uncontested the home originally appraised at $200,000. Further, two witnesses testified Miller influenced the appraisal process because he was unhappy with this amount. Angela Parenza, Miller's office manager, testified Miller directed her to fax HUD settlement statements for Miller-built homes or homes built on lots Miller owned to be used as comparables in the Jordan appraisal. She also testified Miller did not list his homes on the Multiple Listing Service because he frequently changed their sales prices to reflect their highest appraised value, and that keeping his homes off the MLS made it more difficult for appraisers to discover that all of the comparables were Miller-built homes. James Sparks's testimony also linked Miller to the inflated appraisal on the Jordan property. He testified Miller was unsatisfied with the original amount he stood to receive from the bank based on the appraisal which placed the value of the Jordan home at $200,000. Sparks explained Miller had initially hoped Ms. Jordan would receive a bank loan of more than eighty percent of the original appraised value of the property, but

---

[9](...continued)
doctrine.)

when it became apparent that would be impossible, he sought out a new appraisal in order to net what Miller wanted out of the sale. Moreover, Sparks testified that when the first appraiser he worked with would not return the desired $220,000 figure, Vanatta, who Sparks described as the "contact person" between himself and Miller, gave him the name of an appraiser who would return the desired value. Because, under the circumstances of this case, Exhibit 2009 is cumulative of other witness testimony, the court is not left in grave doubt as to whether it had a substantial influence on the outcome of the trial. *See United States v. Clifton*, 406 F.3d 1173, 1179 (10th Cir. 2005) ("Where the wrongly admitted evidence was cumulative of other properly admitted evidence, it is less likely to have injuriously influenced the jury's verdict." (quotation and alteration omitted)). Accordingly, the court concludes its admission was harmless.

**B.** **Challenges to the Sufficiency of the Evidence**

**1.** **Legal Standards**

Following the close of the government's evidence, and again following the close of all evidence at trial, Miller and Irvin moved for entry of judgments of acquittal pursuant to Fed. R. Crim. P. 29, arguing the evidence was insufficient to sustain their convictions. After the jury returned its verdict, the district court issued a lengthy Memorandum and Order addressing the Rule 29 motion as it pertained to the counts on which guilt was found, ultimately denying relief. Miller and Irvin now raise largely the same arguments on appeal.

In reviewing the sufficiency of the evidence and denial of a motion for judgment of acquittal, this court reviews the record *de novo* to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt. *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000). This court does not "weigh conflicting evidence or consider witness credibility, as these duties are delegated exclusively to the jury. Instead, we presume that the jury's findings in evaluating the credibility of each witness are correct." *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003) (quotation and citation omitted).

### 2.     Count 2 – The Lake Ozark Transaction

In contrast with the majority of the charges, Count 2 alleged bank fraud by Miller, Vanatta, and Irvin in connection with their *purchase*, rather than sale, of a home. The home, located on Lake Ozark in central Missouri, was purchased with the intention that repairs and improvements would be made to the property, and it would then be sold for profit (hereafter the "Lake Ozark Transaction"). Miller and Irvin obtained the funds needed to purchase this property by cosigning on a mortgage loan issued by First National Bank of Camdenton, Missouri, with whom Miller had previously dealt successfully on several occasions. Because Irvin was a cosigner on the loan, First National Bank required her to submit certain financial information. Irvin provided the bank with what appeared to be official tax returns and a financial statement prepared by an accounting firm, but testimony at trial indicated these materials were fraudulent. First National Bank ultimately approved Miller's and Irvin's application for a $650,000 loan. In Count 2, the government charged that this transaction constituted bank fraud in violation of 18 U.S.C. § 1344. Although Miller was acquitted, Irvin was found guilty of Count 2.

Bank fraud is defined as the knowing execution, or attempted execution, of "a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. The government elected to prosecute Count 2 solely under the second prong of § 1344, which we have clarified requires a

-19-

showing that the defendant's false or fraudulent pretenses were "material." *United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000). Irvin's sufficiency-of-the-evidence challenge focuses on this requirement, and she contends nothing in the record supports the jury's finding that her representations to First National Bank were material. Instead, Irvin argues, the testimony of First National Bank loan officer Tom Niedergerke established without contradiction that Irvin's representations played no role in the bank's decision to issue the loan whatsoever, and therefore could not have been material.

The record is, in fact, clear that the fraudulent financial information Irvin submitted to First National Bank had no impact on the ultimate issuance of the loan. As Mr. Niedergerke explained, his repeated successful dealings with Miller provided the sole basis of decision to recommend issuance of the mortgage loan to First National's loan committee. Consequently, Irvin's credit information was not even included in Niedergerke's presentation to the loan committee, in which he explicitly stated that "[n]o financial emphasis [had been] placed on Hallie Irvin" in forming his recommendation. None of this, however, forecloses the jury from rationally concluding that Irvin's representations were material.

"In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quotation and alteration omitted); *see also Akers*, 215 F.3d at 1102 (citing *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998), for the proposition that a material misrepresentation is one

-20-

"capable of influencing a bank's actions").  This definition, in referring to natural tendencies and capabilities, establishes materiality in the bank fraud context as an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision.  Defining materiality in this way accords with the thrust of § 1344, which criminalizes the defendant's "scheme or artifice," rather than the completed fraud.  *Neder*, 527 U.S. at 24, 25 ("By prohibiting the 'scheme to defraud,' rather than the completed fraud, the [subjective] elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted.").  It is therefore irrelevant whether Mr. Niedergerke or the First National Bank loan committee were in fact influenced by Irvin's fraudulent representations.  The pertinent inquiry is instead whether Irvin's representations had the *capability* to so influence their decisions.  By convicting Irvin of Count 2, the jury answered this question in the affirmative, and its finding is adequately supported by the record.  Mr. Niedergerke's requirement that Irvin submit her financial information as part of the loan application process, for example, indicates the information was at least potentially relevant to the bank's decision, and Vanatta and Irvin's decision to falsify the requested information indicates they believed it to be so.  Furthermore, Mr. Niedergerke testified it *would* have been relevant to the bank's decision to know that Irvin had submitted fraudulent tax returns.  Because these facts, combined with testimony presented throughout the trial describing the significance of a loan applicant's financial information, could lead a rational trier of facts to conclude Irvin's representations to First National Bank were material, Irvin's conviction on Count

-21-

2 is affirmed.

### 3. Count 4 – Money Laundering

Count 4 charged the defendants with laundering the proceeds they received from the act of bank fraud charged in Count 2. As with Count 2, Irvin was found guilty while Miller was acquitted. The money-laundering statute under which Irvin was tried and convicted, 18 U.S.C. § 1957(a), forbids a person from engaging "in a monetary transaction in criminally derived property of a value greater than $10,000" in which the property "is derived from specified unlawful activity." For Count 4, the "specified unlawful activity" was identified as the substantive act of bank fraud charged by the government in connection with the Lake Ozark Transaction. Accordingly, the jury was instructed that convicting any defendant on Count 4 required proof beyond a reasonable doubt of four elements: (1) the defendant engaged in a monetary transaction affecting interstate commerce; (2) the defendant knew the transaction involved criminally derived property; (3) the transaction involved property valued higher than $10,000; and (4) the property was derived from the act of bank fraud charged in connection with the Lake Ozark Transaction (*i.e.*, the crime charged in Count 2). Irvin raises two challenges to the sufficiency of the evidence supporting her conviction on Count 4.

Irvin first argues that because there is insufficient evidence of materiality to support her conviction for the predicate bank fraud charged in Count 2, there is necessarily insufficient evidence to support the derivative crime of money laundering charged in Count 4. *See United States v. Lake*, 472 F.3d 1247, 1260-61 (10th Cir. 2007)

-22-

(reversing conviction for money laundering where predicate act of wire fraud unsupported by sufficient evidence). As explained above, however, the record provides sufficient evidence of materiality to support the jury's verdict against Irvin on Count 2. Irvin's argument therefore rests on a mistaken premise and must be rejected.

Irvin's second argument challenges the sufficiency of the evidence supporting the jury's required finding that her money laundering transaction involved "criminally derived property." In the context of money laundering, "criminally derived property" is statutorily defined as "any property constituting, or derived from, proceeds obtained from a criminal offense," and the jury was so instructed. 18 U.S.C. § 1957(f)(2). At the time of Irvin's trial, however, the term "proceeds" was not defined by the statute.[10] The defendants, relying on *United States v. Santos*, 553 U.S. 507 (2008), persuaded the district court—over the government's objection—to provide an additional instruction clarifying that the term "'proceeds' means profits" (the "*Santos* Instruction").

The government identified the criminally obtained proceeds laundered in Count 4 to be the loan funds disbursed by First National Bank in connection with the Lake Ozark Transaction. The testimony of two witnesses at trial, however, indicated without contradiction that these loan funds did not constitute *profit* to the defendants because they

---

[10]Congress has since amended the money laundering statute to define the term "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." Fraud Enforcement and Recovery Act of 2009, 123 Stat. 1617, 1618 (2009) (codified at 18 U.S.C. § 1956(c)(9)).

were immediately used to purchase property. That is, the Lake Ozark Transaction loan funds did not accrue to Irvin or Miller, but rather flowed away from them as payment for the Lake Ozark house. Because nothing else in the record indicates whether these loan funds constituted profits, and because the jury was instructed that "'proceeds' means profits," Irvin contends no rational jury could have found she was involved in a transaction involving proceeds obtained from a criminal offense.

Contrary to the *Santos* Instruction given by the district court, the term "proceeds," as used in the version of § 1957 effective at the time of Irvin's trial, is not strictly limited to profits. The district court's initial[11] conclusion to the contrary apparently stemmed from confusion surrounding the Supreme Court's decision in *Santos*, in which a 4-1-4 plurality held that in the context of an illegal gambling operation, proceeds means "profits" rather than "gross receipts." 553 U.S. at 514 (plurality opinion); *id.* at 528 & n.7 (Stevens, J., concurring in judgment); *see also United States v. Thornburgh*, 645 F.3d 1197, 1208-09 (10th Cir. 2011) (describing disagreement among the circuits regarding the significance of *Santos*). This court has since clarified that *Santos*'s holding must be confined to its factual setting, and that "'proceeds' means 'profits' for the purpose of the money laundering statute *only* where an illegal gambling operation is involved." *Thornburgh*, 645 F.3d at 1209 (emphasis in original). In cases not involving illegal

---

[11]In its order denying the defendants' post-trial motions for acquittal, the district court later concluded that "the definition of proceeds as used in § 1957 means gross receipts, notwithstanding that the Court [had earlier] instructed the jury [that proceeds means profits] out of an abundance of caution."

gambling operations, "proceeds" means "gross receipts."  *Id.*; *see also United States v. Van Alstyne*, 584 F.3d 803, 814 (9th Cir. 2009); *United States v. Bucci*, 582 F.3d 108, 123-24 (1st Cir. 2009).  Because Miller's and Irvin's criminal activities did not involve an illegal gambling operation, the latter, broader definition of proceeds applies.

Although the jury instructions given below defined the crime of money laundering more stringently than necessary, they do not direct our consideration of the sufficiency of the evidence.  The government's timely objection to the "proceeds means profits" instruction prevented that instruction from becoming the law of the case.  *United States v. Williams*, 376 F.3d 1048, 1051 (10th Cir. 2004).[12]  Consequently, our review must determine only whether sufficient evidence supports each of the elements actually required by law to sustain a conviction for money laundering under § 1957(a).  *See id.* at 1051-52 & 1052 n.3.

Properly considered, the crime of money laundering requires proof beyond a reasonable doubt that (1) the defendant engaged in or attempted to engage in a monetary transaction; (2) in criminally derived property worth at least $10,000; (3) with knowledge

_____

[12]As explained in *United States v. Williams*, "[t]he doctrine of law of the case is an equitable remedy whose purpose is to prevent the government from arguing on appeal a position which it abandoned below."  376 F.3d 1048, 1051 (10th Cir. 2004). Thus, when the government fails to object to a proposed jury instruction "[t]he law of the case is applied to hold the government to the burden of proving each element of a crime as set out in [the given instruction] even if the unchallenged jury instruction goes beyond the criminal statute's requirements." *Id.*  The rationale driving the doctrine of law of the case is inapplicable where, as here, the government did not abandon its objection to the *Santos* Instruction.  *Id.* at 1052.

that the property was derived from unlawful activity; and (4) the property was, in fact, derived from specified unlawful activity. *Lake*, 472 F.3d at 1260. "'[C]riminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense," 18 U.S.C. § 1957(f)(2) (2008), and "proceeds" means "gross receipts" in cases not involving illegal gambling operations. Because there is no question the funds disbursed by First National Bank could rationally be viewed as the gross receipts of the bank fraud charged in Count 2, and because there was ample evidence Irvin knowingly used those funds to purchase a $600,000 house in Lake Ozark, Missouri, her conviction on Count 4 is affirmed.

### 4.     Count 5 – Money Laundering

Just as Counts 2 and 4 formed a linked pair (bank fraud and money laundering), so too did Counts 3 and 5. Count 3 charged defendants with bank fraud in connection with their efforts to obtain a mortgage loan for Ms. Kerrie Jordan from First Horizon Home Loan Corporation ("First Horizon"), in violation of 18 U.S.C. § 1344. The government presented evidence that Ms. Jordan's credit and financial history were insufficient to secure such a loan and the defendants therefore falsified her loan application submissions to increase her apparent credit-worthiness, inflating her monthly income and bank balances. Furthermore, the government presented evidence defendants had procured an artificially inflated appraisal of Ms. Jordan's intended home. First Horizon ultimately agreed to provide mortgage financing to Ms. Jordan in the amount of $176,000, of which $123,931.82 was used to pay off an outstanding construction loan on Ms. Jordan's new

home.  In Count 5, the government argued this use of the loan proceeds constituted

money laundering in violation of 18 U.S.C. § 1957.  The jury acquitted all defendants of

the substantive act of bank fraud charged in Count 3, but found Miller, Irvin, and Vanatta

guilty of the Count 5 money laundering charge.  Miller and Irvin now challenge the

sufficiency of the evidence supporting their convictions on Count 5.

To convict Miller and Irvin of money laundering in Count 5, the jury was required

to find beyond a reasonable doubt that (1) the defendants knowingly engaged in a

monetary transaction affecting interstate commerce; (2) knowing, at the time, that the

transaction involved criminally derived property; (3) the transaction involved property of

a value greater than $10,000; and (4) the property was derived from the specified

unlawful activity of bank fraud in violation of 18 U.S.C. § 1344.  Because the

government identified the "specified unlawful activity" on which Count 5 rested as the

crime charged in Count 3, the evidence must also be sufficient to support a rational jury's

conclusion the laundered money constituted the proceeds of that substantive act of bank

fraud.  *See, e.g., Lake*, 472 F.3d at 1260-61 (reversing conviction for money laundering

where insufficient evidence supported conviction on predicate offense of wire fraud).  It

is against the proof of this derivative requirement that Miller and Irvin primarily focus

their challenge, but their arguments are quite different. [13]

_____

[13]Miller and Irvin also challenge their money laundering convictions on
Count 5 based on the *Santos* Instruction.  For the same reasons the *Santos*
Instruction argument was rejected in relation to Count 4, it is rejected in relation

(continued...)

Miller contends that because the jury found him not guilty on Count 3, his conviction on Count 5 cannot stand. It is well-settled, however, that an inconsistent verdict is not a sufficient reason for setting a verdict aside. *United States v. Powell*, 469 U.S. 57, 64-66 (1984); *United States v. Harris*, 369 F.3d 1157, 1168 (10th Cir. 2004). "[C]onsistency in verdicts is not required because, where truly inconsistent verdicts have been reached, the most that can be said is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *United States v. McCullough*, 457 F.3d 1150, 1161 n.2 (10th Cir. 2006) (quotations omitted) (concluding defendant's acquittal on conspiracy charges did not require reversal of his conviction for using a telephone to facilitate the conspiracy). For this very reason, other courts have upheld convictions for money laundering even where there was an acquittal on the predicate offense. *See, e.g., United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000) (concluding defendant's acquittal on predicate offense of bankruptcy fraud did not require reversal of his conviction for money laundering). Miller's acquittal on Count 3 does not impact his conviction on Count 5.

Miller also challenges the evidence supporting the second required element of Count 5; namely, that he knew the transaction in question involved criminally derived property. He contends the only evidence he was aware of any wrongdoing in connection

[13](...continued)
to Count 5.

-28-

with the Jordan Transaction came from Ms. Jordan's testimony, in which she stated she complained to Miller about the increase in her sales price *after* the closing. Therefore, Miller reasons, the jury had no rational basis to conclude he had knowledge of the criminally derived nature of the loan proceeds prior to the laundering transaction. Miller understates the contents of the record. The government presented evidence the defendants surreptitiously increased the sales price for Ms. Jordan's home from $200,000 to $220,000 after it became apparent Ms. Jordan's original submissions would not be sufficient to obtain financing. Other evidence indicated the $220,000 sales price was supported by an inflated appraisal which Miller had contributed to by providing the appraiser with Miller-built comparables. Finally, testimony indicated that Miller set the final sales price for his homes and otherwise "controlled everything" about his business. Viewing the evidence in the light most favorable to the government, a rational jury could conclude Miller was aware the proceeds from Ms. Jordan's loan constituted criminally derived property given his personal involvement in the substantive act of bank fraud that procured them.

Irvin's attack on the sufficiency of the underlying bank fraud count is more nuanced. The government elected to submit Count 3 to the jury solely under the second prong of 18 U.S.C. § 1344, which prohibits the knowing execution, or attempted execution, of "a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, *a financial institution*, by means of false or fraudulent pretenses, representations, or promises."

-29-

(emphasis added).  First Horizon, the lender to whom the defendants submitted Ms.

Jordan's falsified loan application, did not accept deposits and lacked a certificate of

FDIC insurance.  It therefore did not constitute a "financial institution" under federal law

applicable at the time.  *See* 18 U.S.C. § 20 (2008). [14]  Acknowledging this, the

government sought to prove the loan funds disbursed by First Horizon constituted

property "owned by, or under the custody or control" of First Tennessee National Bank

("First Tennessee"), First Horizon's corporate parent and a "financial institution" for

purposes of the statute.  Irvin argues the government did not carry its burden of proving

this necessary element of the bank fraud charge, and that her conviction on Count 5 must

therefore fall.

The evidence adduced at trial indicates First Horizon was a wholly owned

operating subsidiary of First Tennessee.  To fund residential single-family mortgage

loans, like the one extended to Ms. Jordan, First Horizon would draw on a $5 billion line

of credit made available to it by First Tennessee.  First Horizon would then bundle such

loans into mortgage-backed securities within thirty to forty-five days of their origination

and sell them to investment banks on the secondary market.  The proceeds from these

sales were then used to repay First Horizon's debts to First Tennessee.  In deciding

whether or not to issue a certain loan, First Horizon followed its own internal loan-

---

[14]18 U.S.C. § 20 has since been amended to include mortgage lending businesses like First Horizon within the definition of "financial institution." *See* Fraud Enforcement and Recovery Act of 2009, 123 Stat. 1617, 1617 (2009) (codified at 18 U.S.C. § 20).

application process and underwriting guidelines, and maintained its own team of due-diligence officers to confirm the security of its loans. First Tennessee played no role in First Horizon's loan-issuance decisions. Finally, the evidence specific to Ms. Jordan's mortgage loan identified First Horizon as the lender, and indicated First Horizon held the deed of trust on the Jordan property.

Irvin concludes from these facts that Ms. Jordan's mortgage loan was strictly the property of First Horizon, and was never owned by, or under the custody or control, of First Tennessee. Her reasoning in this regard appears correct, and First Tennessee's corporate ownership of First Horizon does not change the analysis for "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Count 3, however, did not charge the defendants with scheming to obtain the financial instrument representing Ms. Jordan's mortgage loan. Instead, the government charged them with "[s]ubmitting false loan application information for Kerrie Jordan, borrower, to First Horizon to obtain *proceeds* from First Tennessee Bank." (emphasis added). The single relevant fact, then, is that the loan proceeds disbursed from First Horizon upon its decision to fund Ms. Jordan's mortgage indisputably came from the credit line extended to it by First Tennessee. As former First Horizon litigation analyst Ed Hyne testified at trial, only once the underwriters at First Horizon made the decision to fund a particular loan would it draw against its line of credit with First Tennessee. A rational trier of fact would be perfectly justified in concluding that, until such time, the

-31-

funds comprising the line of credit were owned by, and in the custody and control of, First Tennessee.[15]

Miller's and Irvin's convictions on Count 5 are supported by sufficient evidence and are affirmed.

### 5.    Counts 9 & 10 – Criminal Contempt

Counts 9 and 10 charged the defendants with violating 18 U.S.C. § 3148(c).[16]  That section provides, "[t]he judicial officer may commence a prosecution for contempt . . . if the person has violated a condition of release."  The condition of release implicated in Counts 9 and 10 was the requirement that Miller "not commit any offense in violation of federal, state or local law while on release" from custody in connection with the *Miller I* prosecution.  In Count 9, the government alleged the defendants violated the law by

---

[15]A different conclusion would perhaps be required had First Tennessee *already* loaned First Horizon the funds used for Ms. Jordan's loan prior to their disbursement, for in that case First Tennessee could possibly be said to no longer own or control those funds.  *See, e.g., United States v. Bennett*, 621 F.3d 1131, 1136-47 (9th Cir. 2010) (rejecting argument that FDIC-insured parent bank "owned" funds of wholly-owned subsidiary and reversing bank fraud conviction for insufficiency of evidence).  *But see United States v. Walsh*, 75 F.3d 1, 9 (1st Cir. 1996) (upholding bank fraud conviction where directly defrauded entity was not a "financial institution," but was a wholly-owned subsidiary of one, and where parent bank provided subsidiary's operating capital and exercised control over subsidiary's lending decisions).

[16]The Second Superseding Indictment and Judgments in this case mistakenly state that Counts 9 and 10 were premised upon a violation of 18 U.S.C. § 1348(c).  There is no such subsection.  It is clear from the jury instructions and the context of the case that Counts 9 and 10 are in fact premised upon 18 U.S.C. § 3148(c).

engaging in the federal offense of bank fraud charged in Count 3. Likewise, in Count 10, the government alleged the defendants violated the law by engaging in the federal offense of money laundering charged in Count 5. Both Miller and Irvin were found guilty of Counts 9 and 10, and both challenge the sufficiency of the evidence underlying their convictions.

Miller first contends his conviction on Count 9 must fail because it was specifically linked to the crime charged in Count 3. Because the jury acquitted him of the bank fraud charged in Count 3, he reasons, the government failed to prove a necessary element for conviction on Count 9. As discussed in the context of Miller's challenge to Count 5, however, "consistency in verdicts is not required," and an inconsistent verdict provides no reason for setting a conviction aside. *Powell*, 469 U.S. at 64-66. His conviction on Count 9 is affirmed.

Miller also contends his conviction on Count 10 must fall because it was specifically linked to the crime charged in Count 5, which he believes was unsupported by sufficient evidence for the reasons discussed in Section III(B)(4), *supra*. That argument is, as demonstrated by the above analysis, flawed. Miller's conviction on Count 5 *was* supported by adequate evidence, and Miller's conviction on Count 10 is therefore affirmed.

Irvin contends nothing in the record indicates she was even aware of Miller's conditions of release from *Miller I*, and that without proof of such knowledge the jury could not rationally have found that she knowingly aided and abetted Miller's violation of

-33-

those conditions. *See United States v. Green*, 175 F.3d 822, 832 (10th Cir. 1999) ("The essence of aiding and abetting liability is proof the defendant willfully associated with a criminal venture and sought through some affirmative action to make that venture succeed." (quotation omitted)). The government offers no direct evidence in contradiction of Irvin's position. It instead argues the record contains circumstantial evidence that, when viewed in the light most favorable to the government and combined with all permissible inferences, supports the jury's conclusion Irvin was aware of Miller's conditions of release. Sparks's testimony that he found out about Miller's conditions of release from Vanatta, for example, is cited by the government as sufficient evidence to support a rational person's conclusion that Vanatta also informed Irvin of the conditions. Other evidence indicated business monitor Steve Browne had been to Miller's office to examine certain records, and had also looked into the Lake Ozark Transaction, in which Irvin had played a role. The government urges us to conclude this, too, supports the jury's conclusion that Irvin was aware Miller was subject to a condition of release that forbade him violating federal law.

This evidence, without more, is insufficient to support the jury's conclusion that Irvin knew of Miller's conditions of release. "While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995) (quotations omitted). Both routes to proving Irvin's knowledge

-34-

proposed by the government go beyond the realm of "reasonable inferences" and into impermissible speculation. The conclusion that "if Vanatta told Sparks, he must have told Irvin" rests on no logical basis whatsoever. Similarly, although Browne's presence in the office and review of the Lake Ozark Transaction might have been noticed by Irvin,[17] there is no logical basis to infer she was also made aware of the reasons for his activities. Furthermore, because there is no evidentiary basis for concluding that Irvin was aware of Miller's conditions of release, Irvin's convictions for Counts 9 and 10 cannot be supported on the alternative basis of co-conspirator liability. The doctrine of co-conspirator liability operates to hold a defendant responsible for the crimes of his co-conspirators, if those crimes are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946). Here, because there is no basis to conclude Irvin was even *aware* of Miller's conditions of release, she could not reasonably have foreseen that Miller would violate them, or that their violation was necessary to advance the conspiracy to which she had agreed. Irvin's convictions for Counts 9 and 10 are not supported by sufficient evidence and are reversed.

### C. Closing Arguments

In its closing argument, the government made the following statements to the jury:

There's no question, ladies and gentlemen of the jury, that these folks

---

[17]The evidence also indicated Irvin was rarely present in the office, making this inference itself somewhat tenuous.

targeted the subprime market, people who really had no ability to qualify for these homes. *And they didn't help society.* They didn't help the home buyer by putting them into a house that the buyer was unqualified for. They did just the opposite.

*They're not responsible for everything that's going on in the subprime market right now, but they are a portion of that.*

(emphasis added). Miller and Irvin contemporaneously objected to the emphasized language as unduly inflammatory, and cited it as grounds for a mistrial. The district court overruled this objection and denied the mistrial, reasoning that (i) the government's commentary was justified in light of the evidence that Miller and Irvin *were* involved in the subprime mortgage market; (ii) the government had qualified its statement by indicating that defendants were not the sole cause of the subprime crisis; and (iii) any possible impact of the government's commentary was mitigated by cautionary instructions. It later reminded the jury during final instructions that statements of counsel were not to be viewed as evidence.

Miller and Irvin now repeat their contention that the government's statements during closing arguments were improper commentary, designed to arouse the prejudice and passion of the jurors against them. They claim the government's commentary was particularly prejudicial in light of the economic crisis gripping the nation at the time of the trial, and that there is sufficient reason to conclude it may have influenced the jury's verdict, despite the cautionary jury instructions. Accordingly, Miller and Irvin request reversal of their convictions and a new trial.

"Where the defendant contemporaneously moves for a mistrial on the basis of

prosecutorial misconduct, we review the denial of such a motion for abuse of discretion."

*United States v. Taylor*, 514 F.3d 1092, 1095 (10th Cir. 2008). This review requires

determinations whether (1) the prosecutor's statements were improper and (2) if so,

whether the statements were "harmless beyond a reasonable doubt." *United States v.*

*Martinez-Nava*, 838 F.2d 411, 416 (10th Cir. 1988). Miller and Irvin cannot show the

district court's ruling constituted an abuse of discretion on either aspect of this inquiry.

First, the government's statements were not improper. Miller himself testified that his

use of "creative financing" to obtain financing for unqualified buyers was helpful to

society, and the government is entitled to considerable latitude in responding to such

arguments during its closing. *See, e.g., United States v. Villa-Chaparro*, 115 F.3d 797,

803 (10th Cir. 1997); *United States v. Janus Indus.*, 48 F.3d 1548, 1558 (10th Cir. 1995).

Even if the challenged statements were improper, however, they did not deprive Miller

and Irvin of a fair trial because they were harmless. In evaluating the harm or prejudice

of an improper statement, this court must consider the extent of the misconduct; whether

the district court took steps to mitigate the impact of the misconduct; and the role of the

misconduct within the case as a whole. *Martinez-Nava*, 838 F.2d at 416. The conduct

complained of here comprises two sentences made over the course of a month-long trial,

in response to Miller's own testimony. The district court took pains, during closing

arguments and again during final instructions, to ensure the jury understood that

statements of counsel did not constitute evidence. And the government's case was

otherwise devoid of any suggestion the defendants were responsible for the subprime

-37-

mortgage crisis.  The government's closing argument was therefore neither improper nor prejudicial, and the district court's denial of a mistrial is affirmed.

##### D.      Cumulative Effect of Errors at Trial

Miller contends that, to the extent none of the above-described allegations of error provide sufficient grounds for reversal of his conviction, their cumulative prejudicial impact is such that he should nevertheless be entitled to a new trial.[18]  *See United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009) ("The purpose of cumulative error analysis is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." (quotation omitted)).  We disagree.  Miller has identified, at most, two erroneous evidentiary rulings at the trial court level:  the admission of Exhibit 1-2 (the summary chart) and the admission of Exhibit 2009 (the review appraisal)[19].  As set forth *supra* Part III.A.1., Exhibit 1-2 was harmless in relation to Miller's convictions for counts 5, 9, and 10 because each of those counts related to a discrete instance of criminal conduct, *i.e.* the Jordan Transaction, which was less susceptible to misleading summarization than the counts for which the admission of Exhibit 1-2 was not harmless.  Similarly, as set forth *supra* Part III.A.2., Exhibit 2009 was harmless in relation to Miller's convictions for counts 5, 9, and 10 because it was but one of many pieces of evidence linking him to

---

[18]Irvin does not join in Miller's request for a cumulative-error analysis.

[19]As set forth *supra* Part III.A.2, the court has assumed, without deciding, the admission of Exhibit 2009 was erroneous.

fraudulent conduct in connection with the Jordan Transaction. Even when both are excluded from consideration, the court has no grave doubt as to whether the verdict would have been the same because extensive witness testimony connects Miller to the Jordan Transaction and details the misrepresentations he made in connection with it. The court therefore declines to reverse Miller's convictions on counts 5, 9, and 10 because of cumulative error.

### E.     Sentencing Challenges

Miller challenges the sentence imposed upon him by the district court. He contends the district court improperly calculated the intended loss attributable to his criminal conduct and improperly applied sentencing enhancements for his use of sophisticated means and role as organizer or leader of the criminal enterprise. Because Miller's conviction for conspiracy to commit bank fraud has been reversed, and because the conspiracy count was used to determine Miller's offense level, his sentence must be recalculated on remand. *See* U.S.S.G. § 3D1.3(b) (directing the application of the "offense guideline that produces the highest offense level" in the case of counts grouped together pursuant to § 3D1.2(d) and involving offenses of the same general type). We therefore decline to pass upon the district court's methodology in determining the intended loss flowing from his crimes. Similarly, the sophisticated means enhancement constituted a specific offense characteristic of the reversed conspiracy charge, and Miller's challenge to its applicability need not be addressed at this time. *See id.* § 2B1.1(b)(9)(C).

The reversal of Miller's conviction on the conspiracy count does not, however, prevent the court from reviewing the applicability of the four-level Organizer/Leader enhancement provided under U.S.S.G. § 3B1.1(a), as that enhancement need not be linked to a specific crime of conviction. *See id.* § ch. 3, pt. B, introductory cmt.

> In evaluating the application of a Guidelines enhancement, we review factual findings for clear error, but to the extent the defendant asks us to interpret the Guidelines or hold that the facts found by the district court are insufficient as a matter of law to warrant an enhancement, we must conduct a de novo review.

*United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009) (quotation omitted). In its written order ruling on the parties' objections to the Presentence Report, the district court listed what it considered to be the relevant conduct for purposes of the Organizer/Leader enhancement:

> Without Miller's participation, there would have been no fraudulent loan transactions. Moreover, . . . testimony established that Miller was the organizer and leader, and described his business operations and motives . . . . Miller directed and led others to set prices based on false and inflated appraisals based solely on Miller-built homes, obtain loan approvals with false documentation that buyers were coached to create or that co-conspirators created for them, use mortgage brokers who participated in the fraudulent creation of loan applications and documentation . . . and that builders or Miller fronted down payment in cash or on paper, taking back a secret second mortgage that Miller made little effort to collect, preferring that buyers get it rolled into a new refinance later on.

Miller contends that these findings are insufficient to support the district court's application of the Organizer/Leader enhancement, a contention we review *de novo*.

Sentencing Guidelines § 3B1.1(a) prescribes the application of a four-level increase to a defendant's offense level "[i]f the defendant was an organizer or leader of a

criminal activity that involved five or more participants or was otherwise extensive." A

defendant may be ruled an organizer or leader upon consideration of

> the exercise of decision making authority, the nature of participation in the
> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning or
> organizing the offense, the nature and scope of the illegal activity, and the degree
> of control and authority exercised over others.

*Id.* § 3B1.1, cmt. n.4. Furthermore, the determination of a defendant's leadership role

should be premised on "all conduct within the scope of § 1B1.3 (Relevant Conduct)," *id.*

ch. 3, pt. B, introductory cmt. Such conduct includes "all acts and omissions committed,

aided, abetted, counseled, commanded, induced, procured, or willfully caused by the

defendant . . . that occurred during the commission of the offense of conviction [or] in

preparation for that offense." *Id.* § 1B1.3(a)(1)(A). The factual findings listed as the

basis for the Organizer/Leader enhancement, although cited by the district court as

conduct relevant to Miller's conspiracy conviction, are equally relevant to Miller's money

laundering conviction on Count 5, which rested upon a predicate offense of bank fraud

perpetrated in the same manner as the bank fraud charged in the conspiracy count. They

are now adopted by this court as the conduct relevant to his money laundering conviction

on Count 5 for purposes of determining whether Miller was an organizer or leader.[20] *See*

---

[20]The relevant conduct for application of the Organizer/Leader enhancement
is a legal determination within the plenary review of the appellate court. *See*
*United States v. Caldwell*, 585 F.3d 1347, 1349-50 (10th Cir. 2009) ("We review
the district court's factual finding supporting a determination of relevant conduct
for clear error but review the ultimate determination of relevant conduct de

(continued...)

*United States v. Caldwell*, 585 F.3d 1347, 1350 (10th Cir. 2009) ("[W]hen determining whether certain activity qualifies as relevant conduct under the Guidelines, similarity, regularity, and temporal proximity are the significant elements to be evaluated." (quotation and alteration omitted)).

So defined, Miller's relevant conduct justifies the application of the four-level Organizer/Leader enhancement of § 3B1.1(a). The district court's findings support the conclusion that the criminal activity involved five or more participants (Vanatta, Irvin, Sparks, Sandra Harris, and Miller himself) and that Miller (1) played a central role in the commission of their criminal activities; (2) recruited accomplices to the criminal activity, such as Vanatta; and (3) directed the criminal activity to the extent he retained final authority over sales prices. Rather than offer any argument negating the preceding conclusions, Miller merely complains that neither Sparks nor Middleton directly testified that he was their leader, and that Sparks admitted engaging in bank fraud independent of Miller's involvement. Nevertheless, the indicia of leadership listed in the commentary to § 3B1.1(4) are present, and the district court did not err in applying the Organizer/Leader enhancement.

## IV.    Conclusion

For the foregoing reasons, Miller's conviction on Count 1, and Irvin's convictions on Counts 1, 9, and 10 are **REVERSED**. Their remaining convictions are **AFFIRMED**.

_____

[20](...continued)
novo." (quotation omitted).

Furthermore, the district court's application of the Organizer/Leader enhancement to Miller's sentence is **AFFIRMED**. The matters are remanded to the district court for further proceedings not inconsistent with this opinion.