**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KATHERINE O'NEAL,

    Defendant - Appellant.

No. 18-1365
(D.C. No. 1:15-CR-00353-WJM-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **KELLY**, and **CARSON**, Circuit Judges.
_____

Defendant-Appellant Katherine O'Neal was convicted by a jury of export of

firearms without a Department of State export license and other written authorization

required by 22 U.S.C. § 2278, in violation of 18 U.S.C. § 554(a). She was sentenced to

three years of imprisonment followed by 36 months of supervised release. Prior to trial,

the district court, in an oral ruling, declined to suppress statements Ms. O'Neal made to a

federal officer without <u>Miranda</u> warnings. After trial, the court issued a written ruling

concluding that it should not have admitted those statements, but that the error was

harmless beyond a reasonable doubt. On appeal, the sole issue is whether the admission

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of Ms. O'Neil's unmirandized statements was harmless beyond a reasonable doubt. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm.

## Background

Ms. O'Neal is a naturalized citizen who served in the United States Army for more than a decade. On June 6, 2015, she traveled to the Dominican Republic, her country of birth, on a Delta Airlines flight. Ms. O'Neal was transporting 11 handguns and ammunition in her luggage. She declared these items to the airline. Upon arrival in Santiago, Ms. O'Neal learned that her bags had not arrived with her. When she returned to retrieve her bags the next day, she was met by a Dominican official, Major Jorge Novas-Madrano. Major Novas-Madrano arrested Ms. O'Neal and took her to government offices for questioning by other officials.

During questioning, Ms. O'Neal was interviewed by Special Agent Matthew Larko of the United States Department of Homeland Security, who was posted to the American Embassy. Agent Larko questioned Ms. O'Neal about what permission she had to travel with the firearms. At the time, Ms. O'Neal was being held for suspected violations of Dominican law and no American charges were anticipated. Neither the Dominican officials nor Agent Larko read Ms. O'Neal her <u>Miranda</u> rights. <u>See</u> 384 U.S. 436 (1966).

The United States government later brought criminal charges against Ms. O'Neal. A second superseding indictment charged 17 counts related to the Dominican Republic

incident. 1 R. 267–76. She was convicted of the first count charging unlicensed export of firearms and acquitted of the others. Id. at 622–27.

At trial, the jury heard Agent Larko's testimony, in which he recounted statements made by Ms. O'Neal during questioning. The following excerpt was relevant to the count of conviction:

> [Counsel for the United States]: Did you discuss with [Ms. O'Neal] any conversations she had with an individual at Fort Carson regarding what she would need to take firearms to the Dominican Republic?
>
> [Agent Larko]: Yes. I asked her to explain if she . . . received permission. She said that she spoke with her Sergeant Lane out of Fort Carson, I believe, and he said that all that's required was a conceal[ed] carry permit and that she reported the weapons to the airline.

5 R. 746.

Just before Agent Larko took the stand, the government had called Sergeant Brandon Lane of Fort Carson to deny that Ms. O'Neal had ever consulted him about the requirements for transporting firearms across international borders. Id. at 735. Sergeant Lane testified that he was "the guy to know" on the base if you had a question about guns. Id. at 734.

The only element of the export charge disputed at trial was whether Ms. O'Neal knew that exporting firearms was contrary to law or regulation. The government bore the burden of proving that Ms. O'Neal "generally understood that her actions were

3

unlawful." Id. at 1262. The jury was instructed on the knowledge requirement including

deliberate ignorance. Id. at 1262, 1266.

Agent Larko's testimony was not the only evidence relevant to this issue. The

government also pointed to warnings on both the Delta website[1] and on Bureau of

Alcohol, Tobacco, and Firearms (ATF) forms filled out by Ms. O'Neal when she

purchased the firearms.[2] In addition, the government presented testimony from border

patrol agents about a June 2005 incident involving another attempt by Ms. O'Neal to

bring firearms over international borders. Ms. O'Neal was denied entry to Canada and

returned to Port Huron, Michigan because she did not have the proper permit to take a

firearm into Canada.[3] Agent Ian Wilbur testified that he had informed Ms. O'Neal that

"ATF statutes" set out certain guidelines for firearm export and failure to comply could

lead to fines or other criminal penalties. Id. at 1073. Agent David Fletcher testified that

there were warning signs regarding firearms posted on the way to the border and that he

had asked Ms. O'Neal whether she had obtained the "proper paperwork" to transport a

firearm, which she had not. Id. at 1078, 1080. Finally, the government presented

testimony from several individuals, including Agent Larko, about differing explanations

Ms. O'Neal had given for her purchase and transportation of the firearms. Id. at 749

(informing Agent Larko that she planned to give the guns to her uncle who lives in the

---

[1]  The website warning stated that passengers are "responsible for knowledge of and
compliance with all Federal, State or local laws regarding the possession and
transportation of firearms."  Aplt. Br. at 35 (citing 5 R. 1281).
[2]  Form ATF-4473 contains the following statement: "The state or commerce
department may require you to obtain a license prior to export."  5 R. 422.
[3]  We will refer to this as the "Port Huron evidence."

4

Dominican Republic); id. at 418, 524, 864, 929 (informing firearms dealers that she needed the guns because she is a competitive shooter); id. at 651 (informing Major Novas-Madrano that she was a gun collector); id. at 667 (informing a Dominican official that she meant to "open a business with these weapons"); id. at 711 (informing a Dominican official that she "purchased the weapons to protect herself"); id. at 716 (informing a Dominican official that she "represented the Army in several [shooting] contests").

In its written order, the district court concluded that Agent Larko only testified to one statement with "arguable relevance" to the export count. Id. at 701. That statement — about consulting Sergeant Lane regarding firearm exports — was contradicted by the Sergeant's own testimony. The district court recognized that the evidence could support different inferences about Ms. O'Neal's state of mind ranging from fabrication due to a guilty conscience to actual knowledge that the law forbade her actions. Id. at 702. Be that as it may, the district court concluded that "whatever inference the jury drew from comparing Lane and Larko's testimony, it was insignificant compared to what the jury learned from other witnesses." Id. at 702. The court noted that three border agents provided detailed testimony (for which there was no cross-examination) about Ms. O'Neal's 2005 experience at the Canadian border that was highly probative and alone would have supported a conviction. Id. at 703. Accordingly, it held the error harmless.

### Discussion

This court reviews the record de novo to determine whether a district court's constitutional error was harmless. United States v. Perdue, 8 F.3d 1455, 1469 (10th Cir.

1993). The test for harmlessness is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Yates v. Evatt, 500 U.S. 391, 403 (1991) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)), overruled in part on other grounds by Estelle v. McGuire, 502 U.S. 62, 72 n.4 (1991). This standard does not require that "the jury was totally unaware of that feature of the trial later held to have been erroneous." Id. at 403. Rather, we must "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Id.

Evidence admitted as a result of constitutional error must be "assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 308 (1991). The government bears the burden of making a harmlessness showing. United States v. Mullikin, 758 F.3d 1209, 1211 (10th Cir. 2014). The government may meet its burden by showing "otherwise strong" or "overwhelming" evidence on the disputed issue. United States v. Mikolon, 719 F.3d 1184, 1189 (10th Cir. 2013), accord Mullikin, 758 F.3d at 1214. This test is distinct from a sufficiency inquiry. United States v. Irvin, 682 F.3d 1254, 1264 (10th Cir. 2012). The properly admitted evidence may be legally sufficient to support the jury's verdict without being so substantial that it renders wrongful admission harmless beyond a reasonable doubt. See id.

## Harmless Error Analysis

We conclude that the government has carried its burden and the district court's error was harmless beyond a reasonable doubt. The government presented substantial

evidence on knowledge, as defined by the instructions, that went beyond Ms. O'Neal's statements to Agent Larko and Sergeant Lane's denial. We are persuaded that the improperly admitted statements were a "small piece" of the government's case and the district court's error was therefore harmless. Mikolon, 719 F.3d at 1189.

Ms. O'Neal's statements, as recounted by Agent Larko, were immediately preceded by Sergeant Lane's denial. Presented in concert, these statements were circumstantial evidence that Ms. O'Neal knew her actions were unlawful and concocted a story to instead suggest innocent mistake. Or, alternatively, that Ms. O'Neal invented a story without knowing her actions to be unlawful. Ms. O'Neal urges that her improperly admitted statements, followed by Sergeant Lane's denial, were powerful evidence as to her knowledge or deliberate ignorance of the unlawfulness of her actions.

But even without these statements, the evidence is overwhelming. The Port Huron evidence tended to show that Ms. O'Neal had unsuccessfully tried to export firearms before and either knew that she needed to take certain steps to do so legally in the future or was willfully blind to that fact. Indeed, the agents testified that they had warned Ms. O'Neal that she could be held criminally liable if she tried to export firearms without proper permission. The government also introduced evidence of warnings contained on both ATF forms and the Delta website, that Ms. O'Neal was a long-time gun owner who understood that possession of firearms is governed by complex rules, and testimony about Ms. O'Neal's shifting, and sometimes contradictory, explanations for her actions. The strength of this other evidence of Ms. O'Neal's knowledge or deliberate ignorance of

the unlawfulness of her actions leads us to "declare a belief" that the erroneous admission of her statements was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24.

We briefly address Ms. O'Neal's arguments regarding the Port Huron evidence because they bear on the proper approach to harmless error analysis. Ms. O'Neal claims that the prosecution's lack of focus on the Port Huron evidence in its closing argument shows that this evidence was unpersuasive or unimportant. Conversely, she argues that the prosecution's reliance on her erroneously admitted statements "belie[] [the government's] assertions of harmlessness on appeal." Aplt. Br. at 19 (quoting Irvin, 682 F.3d at 1264).

We are not persuaded. Closing arguments are not evidence, and the jury was so instructed. 5 R. 1254 ("The lawyers' statements and arguments are not evidence."). That instruction is not challenged here, and we presume that juries follow their instructions. See United States v. Rogers, 556 F.3d 1130, 1141 (10th Cir. 2009). Prosecutorial reliance on evidence may be one indicator of importance to the jury, but it is not dispositive of the harmlessness inquiry. It does not help where, as here, we are persuaded that the rest of the record contains overwhelming evidence on the disputed issue.[4]

On these points, Ms. O'Neal places more weight on Irvin than it can reasonably bear. See 682 F.3d at 1254. Irvin does not stand for the proposition that a prosecutor's

---

[4] Ms. O'Neal also points out that Agent Wilbur mistakenly identified ATF as the agency that promulgated firearm export rules, rather than the Department of State. Ms. O'Neal contends that this misidentification might "have caused the jury to doubt their testimony." Aplt. Reply Br. at 12. Ms. O'Neal does not specify what type of doubt this mistake might have aroused and we do not see how it bore on Agent Wilbur's ability to

reliance on evidence in closing conclusively establishes that the evidence contributed to the jury's verdict. Nor does it stand for the inverse rule that failure to emphasize, or even mention, evidence in closing conclusively establishes that the evidence <u>did not</u> contribute to the jury's verdict. Rather, it makes the point that the government's emphasis of a piece of evidence's particular importance may well undercut its assertions of unimportance on appeal. See <u>id.</u> at 1264–65; <u>cf.</u> <u>United States v. Jackson</u>, 636 F.3d 687, 697 (5th Cir. 2011) (placing "great importance" on improperly admitted statements in the case in chief and closing undercut government's argument for harmlessness). The cases do not establish that prosecutorial reliance on erroneously admitted evidence in its closing means that the admission was harmful per se.[5]

## The Dissent

The dissent sees the evidence differently, arguing that Agent Larko's testimony played a "vital" role at Ms. O'Neal's trial. The dissent recognizes that we

recall the incident. In addition, the jury was charged to determine whether Ms. O'Neal knew or generally understood that her actions were unlawful, not which agency promulgated the specific regulations she violated. 5 R. 1262. The jury was specifically instructed that the government need not prove that Ms. O'Neal "knew the exportation or sending was contrary to any <u>specific statute or specific regulation</u>." <u>Id.</u> (emphasis added). We think it unlikely that such a minor mistake would have caused the jury to seriously doubt the whole account and the effect it had on Ms. O'Neal's awareness of rules regarding firearm export.

[5] We are not sure that accepting, arguendo, Ms. O'Neal's contention that we should take the prosecution's focus — or lack thereof — on evidence as a conclusive demonstration of its importance or non-importance to the jury is helpful to her case. The government pointed to several pieces of evidence in its closing argument. The government referred to the fact that Ms. O'Neal had a concealed carry permit (5 R. 1278), filled out at least 11 ATF forms containing warnings about firearm exporting (<u>id.</u>), was a member of the U.S. Army and aware of its various rules (<u>id.</u> at 1279), purchased a ticket from an airline that posted a warning about firearm transportation

are faced with a "cold record" that makes it difficult to assess the impact of witness testimony, but also asserts that it is clear that Agent Larko's testimony about Ms. O'Neal's unmirandized statements carried great weight. The dissent describes his testimony as a "devastating broadside" before which other evidence "paled in comparison" because it allowed the government to "shatter[] Ms. O'Neal's credibility" and "pulverize [her] defense." Agent Larko's testimony is said to have "proved [Ms. O'Neal's] undoing" and "led to [her] conviction."

We respectfully disagree with the dissent's view of the evidence. Initially, it asks: "how can we know what the jury would have decided if Ms. O'Neal's statement to Agent Larko hadn't been wrongfully admitted?" We agree that this can be a difficult question to answer, but our task is to determine whether the government has carried its burden to show that the error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Yates, 500 U.S. at 403.

The dissent is correct that, if the jury credited Sergeant Lane over Ms. O'Neal, it might have doubted her general credibility. But the jury could already have reached that conclusion based on her shifting explanations for why she was attempting to take guns out of the country, an issue the dissent does not discuss in

requirements (id. at 1280), and told shifting stories about her reasons for purchasing and transporting the firearms (id. at 1281–83). By contrast, only three paragraphs of the five pages of trial transcript comprising the government's closing argument on the export charge pertain to the Agent Larko/Sergeant Lane statements. Accepting Ms. O'Neal's logic would suggest that these statements are relatively unimportant compared to the balance of the evidence on this count.

10

depth. Like Ms. O'Neal, the dissent also fails to convincingly account for the force of the Port Huron evidence. In attempting to better explain the purported flaws with this evidence, the dissent claims it left the jury with three questions: (1) how the border patrol agents recalled the specifics of the incident 13 years later (never an issue), (2) how certain it was that Ms. O'Neal actually understood when the agents explained restrictions on taking firearms across borders, and (3) whether Ms. O'Neal could "accurately recall the content of this conversation roughly ten years later."

None of these questions effectively undercuts the considerable force of the Port Huron evidence. First, the dissent elides the fact that border patrol agents explained why they remembered this particular incident — because border turnarounds were highly unusual and the event was so remarkable that it led to a change in policy. Ms. O'Neal also did not need to recall the exact content of the conversation. The jury was being asked to conclude that Ms. O'Neal remembered being turned around and infer that she understood there were steps she needed to take to legally export a firearm. An incident like this would likely be particularly memorable for a member of the armed services, who was entrusted with weapons as a function of her service and trained on how to properly use and handle them. None of the points raised by Ms. O'Neal and echoed by the dissent can change the fact that the jury heard that a similar event had occurred before and Ms. O'Neal was refused entry into another country at the border as a result. This evidence was highly probative of Ms. O'Neal's knowledge or absence of mistake upon attempting another border crossing with weapons in tow.

11

The dissent concedes, as it must, that given the various incriminating facts, "a jury might reasonably infer that Ms. O'Neal had known that bringing guns into the Dominican Republic would be illegal." Though the dissent contends that proving actual knowledge is difficult, it is surely not impossible. According to the dissent, "the government had a problem" in convincing the jury to draw various inferences and find actual knowledge. Though we think the dissent overstates the complexity of this case given the many facts that were uncontroverted, the jury also was instructed that Ms. O'Neal's deliberate ignorance could support knowledge. 5 R. 1266. At a minimum, the evidence showed that Ms. O'Neal was aware that her understanding of the law was erroneous and she consciously sought to avoid obtaining actual knowledge.

The dissent also argues that we should consider that the jury acquitted Ms. O'Neal on sixteen of the seventeen charges brought against her. But those sixteen charges involved different elements that had nothing to do with Ms. O'Neal's knowledge about firearm export laws. Indeed, 12 of the 16 counts were related to her use of the name Katherine O'Neal rather than her birth name on applications to purchase firearms.[6] Moreover, the jury was instructed to consider each count separately.[7] Our harmless error analysis must focus primarily on the evidence

---

[6] Even if we assume the jury's decision on other charges can help us deduce its view of the evidence, it does not necessarily follow that Agent Larko's testimony made the difference between charges. The jury's decision is equally consistent with a belief that Ms. O'Neal was overcharged.

[7] The dissent observes that "a jury might have parsed the counts as the majority does." Parsing the counts to view them separately was mandated by the jury

supporting the count of conviction, and we should not attempt to make apples to oranges comparisons with the other charges in order to guess the general feelings of the jury about the case.

This was simply not a case like Velarde v. Shulsen, cited by the dissent, where the only evidence on the disputed issue was opposing accounts from the defendant and a government witness. 757 F.2d 1093, 1096 (10th Cir. 1985). We believe that the evidence of Ms. O'Neal's knowledge of export requirements, other than Agent Larko's testimony, was overwhelming.

## Conclusion

In her briefs, Ms. O'Neal marshals several other arguments against the strength and relevance of various parts of the government's evidence. We decline the invitation to parse further the significance of individual pieces of evidence in isolation, shorn of their proper context. See Fulminante, 499 U.S. at 308. The proper inquiry is whether, after considering the record as a whole, we are satisfied that the improperly admitted statements were unimportant in relation to the government's otherwise strong evidence. See Yates, 500 U.S. at 404; Mikolon, 719 F.3d at 1189. The government's showing, and our review of the record as a whole, leads us to

---

instructions. See 5 R. 1157 ("A separate crime is charged in each count of the second superseding indictment. You must separately consider the evidence on each count and return a separate verdict. Your verdict as to any one count, whether guilty or not guilty, should not influence your verdict as to any other count."). We presume that juries follow their instructions. See Rogers, 556 F.3d at 1141.

13

conclude that the error was harmless beyond a reasonable doubt.  See Chapman, 386

U.S. at 24.

**AFFIRMED**.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

*United States v. O'Neal*, No. 18-1365
**BACHARACH**, J., dissenting.

This case crystallizes the danger of relying on a cold record to assess harmlessness based on the credibility of witnesses. Without an opportunity to see the witnesses testify, we're ordinarily ill-suited to decide who is telling the truth. Our precedent thus teaches that "where the case comes down to a one-on-one situation, *i.e.*, the word of the defendant against the word of the key prosecution witness, and there is no corroboration on either side, the importance of the defendant's credibility becomes so significant that prosecutorial error attacking that credibility cannot be harmless beyond a reasonable doubt." *Velarde v. Shulsen*, 757 F.2d 1093, 1095 (10th Cir. 1985).

Despite this precedent, the majority concludes that the constitutional error here was harmless based on the credibility of the government witnesses and Ms. O'Neal's own lack of credibility. In my view, the government has not met its burden of proof on harmlessness, so I respectfully dissent.

1. **Ms. O'Neal's un-Mirandized statement was vital to proving her state of mind.**

Ms. O'Neal and the government's witnesses provided conflicting accounts on the key issue—Ms. O'Neal's knowledge that taking guns into the Dominican Republic violated U.S. laws. Without the benefit of

*Miranda* warnings, Ms. O'Neal told Agent Larko that she'd been instructed by a sergeant on her military base that she didn't need a license to take firearms into the Dominican Republic. The government set out to show that Ms. O'Neal had lied to Agent Larko, eliciting testimony from the sergeant that he'd never discussed this topic with Ms. O'Neal. The government thus argued that Ms. O'Neal had lied because she knew that taking guns into the Dominican Republic was illegal. The broadside was devastating and led to Ms. O'Neal's conviction for unlicensed export of a firearm.

The district court later acknowledged that the government had violated the Fifth Amendment by eliciting evidence of Ms. O'Neal's statement to Agent Larko.[1] But the court concluded that the Fifth Amendment violation was harmless. For this conclusion, we engage in de novo review. *United States v. Glass*, 128 F.3d 1398, 1403 (10th Cir. 1997).

In exercising de novo review, we must reverse the conviction unless the government satisfied its "extraordinary burden" of showing that this constitutional violation was harmless beyond a reasonable doubt. *United States v. Robinson*, 583 F.3d 1265, 1274 (10th Cir. 2009). The constitutional violation was harmless beyond a reasonable doubt only if Ms. O'Neal's un-Mirandized statement to Agent Larko did not contribute to the conviction. *United States v. Perdue*, 8 F.3d 1455, 1469 (10th Cir.

---

[1] The government does not contest this conclusion.

2

1993). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991).

In my view, the improperly introduced testimony was vital. In closing argument, the government had confronted the difficulty of proving Ms. O'Neal's knowledge: There was no direct evidence of what Ms. O'Neal had known about U.S. laws governing the export of firearms into the Dominican Republic. The government overcame this challenge by imploring the jury to focus on Ms. O'Neal's statement to Agent Larko.[2]

This focus left little room for reasonable doubt because it'd be hard to imagine why Ms. O'Neal would have lied unless she knew that she'd violated the law. Little wonder that Ms. O'Neal was convicted of exporting guns without legal authorization. But how can we know what the jury would have decided if Ms. O'Neal's statement to Agent Larko hadn't been wrongfully admitted?

The majority disregards the vital role of this improperly introduced testimony, arguing that the government's other evidence of guilt was overwhelming. Maj. Op. at 7. In my view, the majority's approach fails to

---

[2]    The government's reliance on this inadmissible statement provides "a highly relevant measure. . . of the likelihood of prejudice." *United States v. Irvin*, 682 F.3d 1254, 1264 (10th Cir. 2012) (quoting *United States v. DeLoach*, 504 F.2d 185, 192 (D.C. Cir. 1974)).

account for the magnitude of the improperly admitted evidence and the importance of credibility in the jury's assessment of guilt.

**2.      The un-Mirandized statement allowed the government to minimize the weaknesses in its case.**

To determine whether the government proved that the *Miranda* violation was harmless beyond a reasonable doubt, we must consider the magnitude of the un-Mirandized statement in comparison to the entirety of the evidence. *United States v. Baldwin*, 691 F.2d 718, 723–24 (5th Cir. 1982).[3] Without the un-Mirandized statement, the government had to prove beyond a reasonable doubt that Ms. O'Neal had known that bringing guns into the Dominican Republic was illegal.

Proving actual knowledge, however, is difficult. *See Virgin Islands v. Rodriguez*, 423 F.2d 9, 12 (3d Cir. 1970) (stating that "actual knowledge" is "a matter difficult to prove"). The government could prove that Ms. O'Neal had bought a lot of guns, had given inconsistent explanations in the past for why she bought so many guns, and had been turned away from the Canadian border roughly ten years before she got stopped in the Dominican Republic. With these facts, a jury might reasonably infer that Ms. O'Neal

---

[3]      Ms. O'Neal's statement to Agent Larko was ostensibly exculpatory. But the government argued at trial that the statement was false and used the false statement to undermine Ms. O'Neal's credibility. We "must consider the importance of the erroneously admitted exculpatory statement[ ] to the government's proof of guilt in order to assess harmlessness." *United States v. Bailey*, 743 F.3d 322, 342 (2d Cir. 2014).

4

had known that bringing guns into the Dominican Republic would be illegal. But the government had a problem: How could it convince the jury to draw these inferences and find, beyond a reasonable doubt, that Ms. O'Neal had actually known that bringing guns into the Dominican Republic was illegal?

Ms. O'Neal's statement to Agent Larko solved this problem for the government: This statement allowed the government to argue that Ms. O'Neal had lied about why she thought that she could legally bring guns into the Dominican Republic. If the jury agreed that Ms. O'Neal had lied, the jury could naturally infer that Ms. O'Neal had known that she was committing a crime. But, as the district court later acknowledged, the government never should have been allowed to elicit evidence of Ms. O'Neal's un-Mirandized statement.

The government's other evidence of guilt paled in comparison to Ms. O'Neal's un-Mirandized statement. The other evidence consisted of testimony by the border patrol agents, ATF forms signed by Ms. O'Neal, and language on the Delta Airlines website about traveling with firearms. The majority concludes that this evidence shows Ms. O'Neal's recognition of the complexity of laws governing international travel with guns, pointing out that she had given conflicting testimony about her reasons for buying guns and why she was traveling.

The jury might have viewed this evidence as the majority does. But the jury might also have assessed the evidence differently. After all, Ms. O'Neal didn't hide the fact that she was taking guns to the Dominican Republic. She declared all of the guns to the airline and immediately told a customs agent that she had guns in her luggage. Given these voluntary disclosures, defense counsel contended in closing argument that "these are the actions . . . of someone who had no idea . . . it was illegal to take guns from the U.S or bring them to the [Dominican Republic]." R. vol. V, at 1294.

In light of these disclosures and defense counsel's argument, the central issue for the jury was credibility. With the un-Mirandized statement, the government shattered Ms. O'Neal's credibility. But without the un-Mirandized statement, the government's evidence might have had its own credibility challenges.

An example involves the testimony underscored by the district court and the majority: Ms. O'Neal's interaction with the border patrol agents. This interaction took place roughly ten years before the events at issue and nearly thirteen years before the two agents testified. Given the passage of time, the border patrol agents' testimony could reasonably leave the jury with three questions:

1. Did the agents remember precisely what they had said almost thirteen years earlier? Or, like many of us, did they simply think that their memories of the incident were correct?

6

2. Did Ms. O'Neal actually understand the agents when they told her about the restrictions on taking firearms into Canada?

3. Did Ms. O'Neal accurately recall the content of this conversation roughly ten years later (when she flew to the Dominican Republic)?

The border patrol agents acknowledged that the Canadian port of entry had been busy and that their conversations with Ms. O'Neal had been brief. Although one agent testified that he had told Ms. O'Neal that she needed "to obtain an ATF Form 6 to export the firearm from the U.S.," R. vol. V, at 1081, there is no indication that he had explained this requirement (for example, by defining the term "export," as the district court did for the jury).[4]

The border patrol agents did offer an explanation for their ability to recall their encounter with Ms. O'Neal. They said that discovery of firearms at the border was rare and that this incident had led to a procedural change. In the majority's view, this explanation gave "considerable force" to the agents' testimony. Maj. Op. at 11.

---

[4] The jury instructions state that "[t]o 'export' means to send or carry from the United States to another country." R., vol. I, at 599. Without the benefit of these jury instructions, a layperson like Ms. O'Neal might have thought that "export" laws involved only commercial transactions. *See Kuhali v. Reno*, 266 F.3d 93, 109 (2d Cir. 2001) ("[T]he recognition that export constitutes a commercial use of goods has informed the construction of . . . federal criminal statutes [other than 22 U.S.C. § 2278]."); *see also Fla. Sugar Mkt. & Terminal Ass'n v. United States*, 220 F.3d 1331, 1335 (Fed. Cir. 2000) ("[T]oday the *legal* definition of export is generally understood to refer solely to foreign commerce." (emphasis in original)).

7

As the majority suggests, the agents' testimony might have persuaded a jury that Ms. O'Neal had known about the requirements for exporting firearms. But a jury could also reasonably question

- the agents' recall of precisely what they had told Ms. O'Neal nearly thirteen years earlier and

- Ms. O'Neal's understanding and memory of what the agents had said roughly ten years earlier.

In discounting these questions, the majority appears to view the agents' testimony in the light most favorable to the government. But for harmlessness, it is Ms. O'Neal—not the government—who should obtain the benefit of these favorable inferences. *See* p. 2, above. With these inferences, a jury could reasonably doubt Ms. O'Neal's understanding and recall of what the agents had said roughly ten years earlier.

The majority also relies on ATF forms signed by Ms. O'Neal and language on the Delta Airlines website about traveling with firearms. But the ATF forms say only that the State Department or Commerce Department "may" require a license before exporting firearms. Government's Exh. 007, at 3. The forms do not say that a license is required or define the term "export." Similarly, the Delta website instructs passengers that they are "responsible for knowledge of and compliance with all Federal, State, or local laws regarding the possession and transportation of firearms." Defendant's Exh. P, at 3. Like the ATF forms, the website does not explain the requirement of an export license.

8

Finally, the majority observes that Ms. O'Neal "was a long-time gun owner who understood that possession of firearms is governed by complex rules," noting that she had given conflicting testimony about the reasons for her gun purchases and travel plans. Maj. Op. at 7. But these facts do not establish Ms. O'Neal's knowledge of the licensing requirements for exporting firearms.

**3.    The majority fails to consider how the inadmissible statement undermined Ms. O'Neal's credibility while bolstering the government's case.**

In assessing this evidence, the majority notes that the jury could draw inferences favoring the government on the issue of actual knowledge. But Ms. O'Neal argued at trial that the jury should reject those inferences, observing that no one had told her about the licensing requirements.

In light of the conflicting inferences from the evidence, Ms. O'Neal's un-Mirandized statement proved her undoing: The jury could readily conclude that she had lied to Agent Larko when pressed on why she thought that she could bring firearms into the Dominican Republic. The district court magnified the impact of the potential lie by telling the jurors that they could consider Ms. O'Neal's statements in deciding what she had known.[5] And in closing argument, the government invited the jury to

---

[5]    The jury instruction stated:

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because

9

consider Ms. O'Neal's lie as a window into her state of mind, arguing that she would "say anything she can to make things better for herself." R. vol. V, at 1281, 1283.

In these ways, the un-Mirandized statement allowed the government to pulverize Ms. O'Neal's defense and to minimize the weaknesses in the government's own case, such as the passage of nearly thirteen years since the incident at the Canadian border and the absence of a clear statement of the licensing requirements either in the ATF forms or on the Delta website. *See United States v. Shannon*, 766 F.3d 346, 359 n.18 (3d Cir. 2014) ("Although [the government's evidence] may well be sufficient to convict, it is not enough to sustain a conviction when, as in this case, there has been a Fifth Amendment violation and the case depends so heavily on whether one believes the defendant's story.")

The upshot is reflected in the verdict: Ms. O'Neal was acquitted on sixteen of seventeen counts. The jury's sixteen findings of "not guilty" came after the government had raised Ms. O'Neal's familiarity with guns and varying explanations for her gun purchases and travel. But these

---

there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made, or acts done by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

R. vol. I, at 606.

10

arguments did not convince the jury to convict on sixteen of the seventeen counts.

The majority points out that these other counts involved different evidence and elements. A jury might have parsed the counts as the majority does. But a jury might also have distinguished the export count based on the impact of Ms. O'Neal's un-Mirandized statement to Agent Larko. We thus cannot conclude beyond a reasonable doubt that Ms. O'Neal's statement was "unimportant [as to the export charge] in relation to everything else the jury considered on the issue in question." *Yates v. Evatt*, 500 U.S. 391, 403 (1991); *see United States v. Harrison*, 34 F.3d 886, 893 (9th Cir. 1994) ("[T]he jury's decision to acquit [the defendant] of the other money laundering and financial structuring charges impacts upon our holding [that the Fifth Amendment violation was not harmless].").

## 4.    Conclusion

I would conclude that the violation of Ms. O'Neal's Fifth Amendment right was not harmless beyond a reasonable doubt. Given this conclusion, I would reverse the conviction.